# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED
IN OPEN COURT

SEP 27 2012

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>CONCEPCION BENITEZ-PINEDA, )<br>also known as "Conchi" and "Concha" )<br>(Counts 1, 2, and 3) )<br><br>ALEX OMAR MEJIA MORENO, )<br>also known as "Gordito" )<br>(Counts 1, 2, and 3) )<br><br>NELSON AMAYA ESCALON, )<br>also known as "Choco" and "Choquito" )<br>(Counts 1, 2, and 3) )<br><br>CARLOS LENIN MEJIA AMAYA, )<br>(Counts 2 and 3) )<br><br>JOSE DELORES VANEGAS, )<br>also known as "Chivito" )<br>(Counts 2 and 4) )<br><br>DOMINGO GOMEZ-RIVERA, )<br>also known as "Flaco" and "Flaquito," )<br>(Count 2) )<br>)<br>Defendants. ) | Criminal Case No. 1:12-cr-00255<br><br>Honorable Liam O'Grady<br><br>Count 1: 21 U.S.C. §§ 952(a), 960(a)(1), and 963<br>(Conspiracy to import five (5) kilograms or more of cocaine)<br><br>Count 2: 21 U.S.C. §§ 841(a)(1) and 846<br>(Conspiracy to distribute cocaine)<br><br>Count 3: 18 U.S.C. §§ 1956(a)(2)(A) and 1956(h)<br>(Conspiracy to commit money laundering)<br><br>Count 4: 18 U.S.C. § 924(c)(1)(A)<br>(Possession of a firearm in furtherance of a drug trafficking crime)<br><br>Forfeiture: 18 U.S.C. § 924(d),<br>21 U.S.C. § 853, and 28 U.S.C. § 2461(c) |

## THIRD SUPERSEDING INDICTMENT

September 2012 Term - at Alexandria, Virginia

## GENERAL ALLEGATIONS

THE GRAND JURY CHARGES THAT:

1.    Defendants **CONCEPCION BENITEZ-PINEDA** (also known as "Conchi" and "Concha"), **ALEX OMAR MEJIA MORENO** (also known as "Gordito"), and **NELSON**

AMAYA ESCALON (also known as "Choco" and "Choquito"), and others, both known and unknown to the Grand Jury, conspired to import cocaine from Honduras into the United States. Co-conspirators in Honduras primarily hid the cocaine within seemingly innocent items, including shoes and decorative wooden frames, that were given to human couriers to smuggle onto commercial airline flights from Honduras to the United States. Couriers flew into Washington Dulles International Airport, within the Eastern District of Virginia, among other airports within the United States. A courier would smuggle as much as several kilograms of cocaine in one trip. Co-conspirators often referred to couriers as "travelers."

2.      The defendants, **CONCEPCION BENITEZ-PINEDA, ALEX OMAR MEJIA MORENO, NELSON AMAYA ESCALON, CARLOS LENIN MEJIA AMAYA, JOSE DELORES VANEGAS** (also known as "Chivito"), and **DOMINGO GOMEZ-RIVERA** (also known as "Flaco" and "Flaquito"), and others, both known and unknown to the Grand Jury, further conspired to distribute the cocaine imported from Honduras for profit within the Eastern District of Virginia and elsewhere within the United States.

3.      In order to promote and carry on the conspiracy to import cocaine, defendants **CONCEPCION BENITEZ-PINEDA, ALEX OMAR MEJIA MORENO, NELSON AMAYA ESCALON,** and **CARLOS LENIN MEJIA AMAYA,** and others, both known and unknown to the Grand Jury, further conspired to launder a portion of the money generated by the distribution of cocaine by sending it via wire transfers from the United States to Honduras. This money was intended for, among other purposes, payment for cocaine previously provided and for new deliveries of cocaine.

2

## WAYS, MANNERS, AND MEANS

4.     The primary purpose of the conspiracies was to make as much money as possible through the importation and distribution of cocaine. The ways, manners, and means by which the defendants and their co-conspirators, both known and unknown to the Grand Jury, carried out this purpose included, but was not limited to, the following:

5.     Members of the conspiracies played different roles, took upon themselves different tasks, and participated in the affairs of the conspiracies through various criminal acts. They made themselves and their services available to each other at various times throughout the conspiracies and participated in certain ventures on an "as needed" basis.

6.     Members of the conspiracies used various methods to conceal the conspiracies and their unlawful drug trafficking activities in order to ensure the continuing existence and success of the conspiracies. One such method was hiding cocaine within the seemingly innocent items so as to make it more likely couriers would not be caught smuggling the cocaine into the United States. Another was for members of the conspiracies to notify each other to the presence of law enforcement or when a co-conspirator was arrested for drug trafficking activity.

7.     Members of the conspiracies used cellular telephones to communicate with each other to facilitate their unlawful drug trafficking activities. In doing so, they used various methods to avoid the detection of law enforcement, including communicating on pre-paid cellular telephones not associated with their real names; changing the telephones and/or telephone numbers they used; and using coded language to try and disguise the nature of their communications. For instance, they used code words to refer to cocaine, including, but not limited to, "material," "milk," "butter," "meat," "cow," "calf," "mandarin," "orange," "shirt," "CD," "paint," and "song."

8.     Members of the conspiracies enlisted the services of and paid different couriers to bring the seemingly innocent items containing cocaine with them on flights from Honduras into the United States.

9.     Members of the conspiracies arranged for and facilitated the transfer of the items containing cocaine from the couriers to other co-conspirators and themselves once the couriers arrived in the United States, to include paying people to pick the items up from the couriers.

10.    Members of the conspiracies in Honduras marked the items containing cocaine in distinctive ways as an indication of which specific member (or members) of the conspiracies in the United States was the intended recipient of the items.

11.    Members of the conspiracies in the United States distributed quantities of cocaine to their customers and to each other. Before doing so, they sometimes added adulterant to the cocaine to increase its quantity, or converted a portion of the cocaine into cocaine base (commonly known as "crack cocaine").

12.    Members of the conspiracies in Honduras at times provided the cocaine on consignment to members of the conspiracies in the United States, accepting full payment after it had been distributed in the United States (commonly known as "fronting"). Members of the conspiracies in the United States at times did the same when they redistributed the cocaine to their customers and each other.

13.    Members of the conspiracies in the United States collected and facilitated the collection of money paid in exchange for the cocaine distributed in furtherance of the conspiracies.

14.    When wiring money from the United States to Honduras to pay for cocaine and otherwise promote and carry on the conspiracy to import cocaine, members of the conspiracies

would use various methods to attempt to avoid detection. For example, they would limit the amount of money sent in a single transaction. They would also enlist other people, to include other members of the conspiracies, to send the wire transfers.

15. Certain members of the conspiracies possessed firearms and ammunition in furtherance of the conspiracies as protection for themselves, their co-conspirators, the cocaine, and the money and assets generated by the importation and distribution of the cocaine.

OVERT ACTS

16. In furtherance of the conspiracies and to effect the objects thereof, the defendants and their co-conspirators, both known and unknown to the Grand Jury, committed overt acts in the Eastern District of Virginia and elsewhere, including, but not limited to, the following:

17. At various times during the pendency of the conspiracies, members of the conspiracies communicated via cellular telephone with each other, both in spoken conversations and text messages. Examples include:

a. On or about February 17, 2012, **ALEX OMAR MEJIA MORENO** told SAMUEL BENITEZ-PINEDA (also known as "Wilfredo Benitez," "Roque," and "Chiripa"), a co-conspirator in the United States, that a frame **MEJIA MORENO** opened up did not contain the full amount of cocaine **MEJIA MORENO** was expecting.

b. On or about February 18, 2012, **DOMINGO GOMEZ-RIVERA** ordered a quantity of cocaine from SAMUEL BENITEZ-PINEDA. SAMUEL BENITEZ-PINEDA explained that **CONCEPCION BENITEZ-PINEDA** had recently left their residence to go send a wire transfer. SAMUEL BENITEZ-PINEDA said he would call **GOMEZ-RIVERA** after **CONCEPCION BENITEZ-PINEDA** returned to the residence and that **GOMEZ-RIVERA** could pick up the cocaine at that time.

c.     On or about February 22, 2012, **DOMINGO GOMEZ-RIVERA** ordered a quantity of cocaine from SAMUEL BENITEZ-PINEDA and the two arranged to meet later. SAMUEL BENITEZ-PINEDA explained that he was waiting for **CONCEPCION BENITEZ-PINEDA** to return to their residence.

d.     On or about February 26, 2012, SAMUEL BENITEZ-PINEDA told **NELSON AMAYA ESCALON** that he (SAMUEL BENITEZ-PINEDA) had cocaine to supply to **AMAYA ESCALON. AMAYA ESCALON** agreed to meet SAMUEL BENITEZ-PINEDA and pick up the cocaine.

e.     On or about February 26, 2012, SAMUEL BENITEZ-PINEDA again spoke with **NELSON AMAYA ESCALON** to arrange a time to meet for **AMAYA ESCALON** to pick up the cocaine.

f.     On or about March 6, 2012, **ALEX OMAR MEJIA MORENO** told SAMUEL BENITEZ-PINEDA that he (**MEJIA MORENO**) had changed his telephone number.

g.     On or about March 6, 2012, **JOSE DELORES VANEGAS** ordered a quantity of cocaine from SAMUEL BENITEZ-PINEDA and explained that he (**VANEGAS**) likes to keep his cocaine customers happy.

h.     On or about March 10, 2012, **JOSE DELORES VANEGAS** ordered a quantity of cocaine from SAMUEL BENITEZ-PINEDA, but also complained about the quality of cocaine SAMUEL BENITEZ-PINEDA had supplied **VANEGAS** recently. SAMUEL BENITEZ-PINEDA explained that **VANEGAS** was not the only person who had complained about the quality of cocaine they received from SAMUEL BENITEZ-PINEDA.

i.     On or about March 11, 2012, SAMUEL BENITEZ-PINEDA asked **JOSE DELORES VANEGAS** if VANEGAS would sell SAMUEL BENITEZ-PINEDA a 9mm

firearm. **VANEGAS** agreed to sell the 9mm firearm and also said it was possible for him to provide SAMUEL BENITEZ-PINEDA with a .45-caliber firearm.

      j.     On or about March 12, 2012, **ALEX OMAR MEJIA MORENO** and SAMUEL BENITEZ-PINEDA discussed an outstanding debt **MEJIA MORENO** owed to SAMUEL BENITEZ-PINEDA for cocaine, and also that SAMUEL BENITEZ-PINEDA had sent money from the United States to co-conspirators in Honduras.

      k.     On or about March 18, 2012, JOSE FREDY DELCID (also known as "Oscar Salgado," "Oscar," Franklin," "Chami," and "Matador"), a co-conspirator in the United States, told SAMUEL BENITEZ-PINEDA that he (DELCID) supplied **CARLOS LENIN MEJIA AMAYA** with cocaine to sell to other people.

      l.     On or about March 25, 2012, JOSE FREDY DELCID told **CARLOS LENIN MEJIA AMAYA** to deliver a quantity of cocaine to another person.

      m.     On or about March 26, 2012, JOSE FREDY DELCID told **CARLOS LENIN MEJIA AMAYA** to send money via wire transfer from the United States to Honduras.

      n.     On or about March 27, 2012, **CONCEPCION BENITEZ-PINEDA** spoke with a co-conspirator in Honduras whose identity is known to the Grand Jury (hereafter "Co-Conspirator A") about cocaine the co-conspirator was going to send to the United States through a courier for **CONCEPCION BENITEZ-PINEDA** and other members of the conspiracies in the United States. Co-Conspirator A explained that the cocaine was coming from Colombia.

      o.     On or about March 29, 2012, **DOMINGO GOMEZ-RIVERA** explained to SAMUEL BENITEZ-PINEDA that he (**GOMEZ-RIVERA**) had an encounter with law

enforcement officers the previous day and that he discarded cocaine because he thought the law enforcement officers were going to search his residence.

p.     On or about April 6, 2012, **ALEX OMAR MEJIA MORENO** and SAMUEL BENITEZ-PINEDA talked about MARTIN JUAREZ-LOPEZ, a co-conspirator in the United States, being arrested in Fairfax County, Virginia, for selling cocaine to an undercover law enforcement officer.

q.     On or about April 8, 2012, JOSE FREDY DELCID warned **CARLOS LENIN MEJIA AMAYA** about the presence of law enforcement and told **MEJIA AMAYA** not to come outside.

r.     On or about April 8, 2012, **CONCEPCION BENITEZ-PINEDA** and **ALEX OMAR MEJIA MORENO** discussed ordering cocaine from Honduras.

s.     On or about April 8, 2012, SAMUEL BENITEZ-PINEDA and **NELSON AMAYA ESCALON** arranged to meet so **AMAYA ESCALON** could pick up cocaine.

t.     On or about April 10, 2012, **ALEX OMAR MEJIA MORENO** and SAMUEL BENITEZ-PINEDA agreed that they needed to meet with MARTIN JUAREZ-LOPEZ when he got out of jail. **MEJIA MORENO** and SAMUEL BENITEZ-PINEDA expressed concern about JUAREZ-LOPEZ speaking with law enforcement about them and others members of the conspiracies.

u.     On or about April 11, 2012, SAMUEL BENITEZ-PINEDA told **NELSON AMAYA ESCALON** that he (SAMUEL BENITEZ-PINEDA) had cocaine to supply to **AMAYA ESCALON**. **AMAYA ESCALON** told SAMUEL BENITEZ-PINEDA to leave the cocaine with **CARLOS LENIN MEJIA AMAYA**, from whom **AMAYA ESCALON** would pick it up.

v.    On or about April 13, 2012, SAMUEL BENITEZ-PINEDA told **CONCEPCION BENITEZ-PINEDA** that he was going to meet **DOMINGO GOMEZ-RIVERA** and supply him with a quantity of cocaine. SAMUEL BENITEZ-PINEDA asked **CONCEPCION BENITEZ-PINEDA** to wait for him until he was done with the meeting. SAMUEL BENITEZ-PINEDA then spoke with **GOMEZ-RIVERA** to discuss where they would meet.

w.    On or about April 16, 2012, a co-conspirator in the United States whose identity is not known to the Grand Jury (hereafter "Co-Conspirator B") called **CONCEPCION BENITEZ-PINEDA** to order a quantity of cocaine. **CONCEPCION BENITEZ-PINEDA** told Co-Conspirator B that SAMUEL BENITEZ-PINEDA would deliver the cocaine. **CONCEPCION BENITEZ-PINEDA** then called SAMUEL BENITEZ-PINEDA and told him to deliver the cocaine to Co-Conspirator B.

x.    On or about April 20, 2012, **CONCEPCION BENITEZ-PINEDA** spoke with Co-Conspirator A to arrange a shipment of cocaine from Honduras to the United States. **CONCEPCION BENITEZ-PINEDA** said she would arrange for money to be sent via wire transfer from the United States to Honduras to pay for the cocaine, and further requested that Co-Conspirator A mark the packaging containing the cocaine with the letter "C" to distinguish it as being intended for **CONCEPCION BENITEZ-PINEDA**.

y.    On or about April 30, 2012, **JOSE DELORES VANEGAS** offered to introduce a person to SAMUEL BENITEZ-PINEDA whom SAMUEL BENITEZ-PINEDA could supply with cocaine.

z.     On or about May 6, 2012, **JOSE DELORES VANEGAS** ordered a quantity of cocaine from SAMUEL BENITEZ-PINEDA and explained that he (**VANEGAS**) had a measuring scale at home and would add adulterant to the cocaine.

18.     On or about March 7, 2012, MELCY YALEXSY GUEVARA-BARRERA, a co-conspirator in the United States, traveled to New York to pick up from a courier a shipment of cocaine that arrived from Honduras and to bring it back to the Eastern District of Virginia. The cocaine, which was hidden inside shoes and decorative wooden frames, was intended for members of the conspiracies in the United States, to include **ALEX OMAR MEJIA MORENO**, GUEVARA-BARRERA, and SAMUEL BENITEZ-PINEDA. Examples follow of additional actions by **MEJIA MORENO** and co-conspirators in relation to this shipment of cocaine:

a.     On or about March 6, 2012, SAMUEL BENITEZ-PINEDA told JOSE FREDY DELCID that the courier had arrived in New York with three-and-a-half kilograms of cocaine.

b.     On or about March 8, 2012, MELCY YALEXSY GUEVARA-BARRERA and SAMUEL BENITEZ-PINEDA discussed meeting at GUEVARA-BARRERA's residence to divide up the cocaine.

c.     On or about March 8, 2012, SAMUEL BENITEZ-PINEDA and **ALEX OMAR MEJIA MORENO** went into MELCY YALEXSY GUEVARA-BARRERA's residence to pick up a portion of the cocaine. While all three were inside the residence, SAMUEL BENITEZ-PINEDA spoke with a co-conspirator in Honduras whose identity is known to the Grand Jury about what specific items containing cocaine that co-conspirator and others in Honduras had sent with the courier.

d. On or about March 8, 2012, **ALEX OMAR MEJIA MORENO** told SAMUEL BENITEZ-PINEDA that frames **MEJIA MORENO** opened up did not contain the full amount of cocaine **MEJIA MORENO** was expecting.

19. On or about March 22, 2012, a courier arrived at Washington Dulles International Airport, in Loudoun County, Virginia, on a flight from Honduras. Law enforcement officers found in the courier's luggage over approximately three (3) kilograms of a mixture and substance containing a detectable amount of cocaine hidden inside decorative wooden frames and shoes. The cocaine was intended for members of the conspiracies in the United States, to include **CONCEPCION BENITEZ-PINEDA**, SAMUEL BENITEZ-PINEDA, and JOSE FREDY DELCID. Several of the defendants and co-conspirators discussed the courier over the telephone, both before and after law enforcement found the cocaine. For instance:

a. On or about March 21, 2012, SAMUEL BENITEZ-PINEDA told **JOSE DELORES VANEGAS** that the courier was arriving the next day. **VANEGAS** said that he and SAMUEL BENITEZ-PINEDA worked well together, and the two discussed that SAMUEL BENITEZ-PINEDA would provide **VANEGAS** with a sample of the cocaine to see if it was of a good enough quality to satisfy **VANEGAS**'s customers.

b. On or about March 21, 2012, JOSE FREDY DELCID told **CONCEPCION BENITEZ-PINEDA** that a portion of the cocaine the courier was bringing was intended for **CONCEPCION BENITEZ-PINEDA**.

c. On or about March 23, 2012, SAMUEL BENITEZ-PINEDA told JOSE FREDY DELCID that **CONCEPCION BENITEZ-PINEDA** had gone to gather more information about the courier at the house in Virginia where the courier was supposed to go after arriving at the airport.

20.     On or about April 20, 2012, a courier arrived at George Bush Intercontinental Airport, in Houston, Texas, on a flight from Honduras. Law enforcement officers found in the courier's luggage over approximately one (1) kilogram of a mixture and substance containing a detectable amount of cocaine hidden inside decorative wooden frames and statues. The cocaine was intended for members of the conspiracies in the United States, to include **CONCEPCION BENITEZ-PINEDA** and JOSE FREDY DELCID. Several of the defendants and co-conspirators discussed the courier over the telephone, both before and after law enforcement found the cocaine. For instance:

a.      On or about April 16, 2012, **CONCEPCION BENITEZ-PINEDA** spoke with Co-Conspirator A, who told **CONCEPCION BENITEZ-PINEDA** the name of the courier and described that there was glass in the frames the courier would be bringing from Honduras to the United States.

b.      On or about April 16, 2012, **CONCEPCION BENITEZ-PINEDA** told JOSE FREDY DELCID the name of the courier and described that there was glass in the frames the courier would be bringing from Honduras to the United States.

c.      On or about April 21, 2012, **CONCEPCION BENITEZ-PINEDA** told SAMUEL BENITEZ-PINEDA that the courier had problems at the airport in Houston.

d.      On or about April 24, 2012, **CONCEPCION BENITEZ-PINEDA** spoke with a relative of the courier and inquired whether the courier had come to Virginia. The relative said the courier was still in Houston.

21.     At various times during the pendency of the conspiracies, members of the conspiracies sent, or caused to have sent, money via wire transfer from the United States to members of the conspiracies in Honduras. Examples include:

a.      On or about September 6, 2011, **CONCEPCION BENITEZ-PINEDA** sent, or caused to be sent, a wire transfer valued at approximately $1,390 to a co-conspirator in Honduras whose identity is known to the Grand Jury.

b.      On or about October 9, 2011, **CARLOS LENIN MEJIA AMAYA** sent, or caused to be sent, a wire transfer valued at approximately $1,000 to a co-conspirator in Honduras whose identity is known to the Grand Jury.

22.      On or about May 10, 2012, **JOSE DELORES VANEGAS** possessed firearms, to wit: a Sig Sauer P239 9mm handgun and a York .22-caliber handgun, in furtherance of the conspiracy to distribute cocaine.

<u>COUNT ONE</u>

## Conspiracy to Import Five (5) Kilograms or More of Cocaine

THE GRAND JURY FURTHER CHARGES THAT:

23.     Paragraphs 1 through 22 of this Second Superseding Indictment are specifically re-alleged and incorporated by reference as if they were fully set forth here.

24.     Between in and around 2010 and May 2012, the exact dates being unknown to the Grand Jury, within the Eastern District of Virginia and elsewhere, defendants **CONCEPCION BENITEZ-PINEDA** (also known as "Conchi" and "Concha"), **ALEX OMAR MEJIA MORENO** (also known as "Gordito"), and **NELSON AMAYA ESCALON** (also known as "Choco" and "Choquito"), did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with others, both known and unknown to the Grand Jury, to unlawfully, knowingly, and intentionally import into the United States from a place outside thereof, that is, Honduras, five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 952(a) and 960(a)(1).

(In violation of Title 21, United States Code, Section 963.)

## COUNT TWO

### Conspiracy to Distribute Cocaine

THE GRAND JURY FURTHER CHARGES THAT:

25.     Paragraphs 1 through 22 of this Second Superseding Indictment are specifically re-alleged and incorporated by reference as if they were fully set forth here.

26.     Between in and around 2010 and May 2012, the exact dates being unknown to the Grand Jury, within the Eastern District of Virginia and elsewhere, the defendants, **CONCEPCION BENITEZ-PINEDA** (also known as "Conchi" and "Concha"), **ALEX OMAR MEJIA MORENO** (also known as "Gordito"), **NELSON AMAYA ESCALON** (also known as "Choco" and "Choquito"), **CARLOS LENIN MEJIA AMAYA, JOSE DELORES VANEGAS** (also known as "Chivito"), and **DOMINGO GOMEZ-RIVERA** (also known as "Flaco" and "Flaquito") did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with others, both known and unknown to the Grand Jury, to unlawfully, knowingly, and intentionally distribute a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

27.     Defendants **CONCEPCION BENITEZ-PINEDA, ALEX OMAR MEJIA MORENO,** and **NELSON AMAYA ESCALON** personally distributed; aided and abetted others to distribute; and could reasonably foresee that others would distribute during and in furtherance of the conspiracy five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(b)(1)(A)(ii)(II).

28.     Defendants **CARLOS LENIN MEJIA AMAYA, JOSE DELORES VANEGAS,** and **DOMINGO GOMEZ-RIVERA** personally distributed; aided and abetted others to distribute; and could reasonably foresee that others would distribute during and in furtherance of the conspiracy 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(b)(1)(B)(ii)(II).

(All in violation of Title 21, United States Code, Section 846.)

## COUNT THREE

### Conspiracy to Commit Money Laundering

THE GRAND JURY FURTHER CHARGES THAT:

29.     Paragraphs 1 through 22 of this Second Superseding Indictment are specifically re-alleged and incorporated by reference as if they were fully set forth here.

30.     Between in and around 2010 and in and around May 2012, the exact dates being unknown to the Grand Jury, within the Eastern District of Virginia and elsewhere, defendants **CONCEPCION BENITEZ-PINEDA** (also known as "Conchi" and "Concha"), **ALEX OMAR MEJIA MORENO** (also known as "Gordito"), **NELSON AMAYA ESCALON** (also known as "Choco" and "Choquito"), and **CARLOS LENIN MEJIA AMAYA**, did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with others, both known and unknown to the Grand Jury, to transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, that is, conspiracy to import cocaine, in violation of Title 21, United States Code, Sections 952(a), 960(a)(1), and 963, as set forth and charged in Count One of this Second Superseding Indictment, which count is hereby re-alleged and fully incorporated herein by reference.

(In violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 1956(h).)

## COUNT FOUR

**Possession of a Firearm in Furtherance of a Drug Trafficking Crime**

THE GRAND JURY FURTHER CHARGES THAT:

31.     Paragraphs 1 through 22 of this Second Superseding Indictment are specifically re-alleged and incorporated by reference as if they were fully set forth here.

32.     On or about May 10, 2012, within the Eastern District of Virginia, defendant **JOSE DELORES VANEGAS** (also known as "Chivito") did unlawfully and knowingly possess firearms, to wit: a Sig Sauer P239 9mm handgun and a York .22-caliber handgun, in furtherance of a drug trafficking crime for which the defendant may be prosecuted in a court of the United States, that is, conspiracy to distribute cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, as set forth and charged in Count Two of this Second Superseding Indictment, which count is hereby re-alleged and fully incorporated herein by reference.

(In violation of Title 18, United States Code, Section 924(c)(1)(A).)

<u>FORFEITURE</u>

33.     Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, the defendants,

**CONCEPCION BENITEZ-PINEDA** (also known as "Conchi" and "Concha"), **ALEX OMAR**

**MEJIA MORENO** (also known as "Gordito"), **NELSON AMAYA ESCALON** (also known as

"Choco" and "Choquito"), **CARLOS LENIN MEJIA AMAYA, JOSE DELORES**

**VANEGAS** (also known as "Chivito"), and **DOMINGO GOMEZ-RIVERA** (also known as

"Flaco" and "Flaquito") are hereby notified that:

34.     Defendants **CONCEPCION BENITEZ-PINEDA, ALEX OMAR MEJIA**

**MORENO,** and **NELSON AMAYA ESCALON,** if convicted of Count One or Count Two of

this Second Superseding Indictment, shall forfeit to the United States pursuant to Title 21, United

States Code, Section 853, any property constituting, or derived from, any proceeds the defendant

obtained, directly or indirectly, as the result of such violation, including, but not limited to any of

the defendant's property used, or intended to be used, in any manner or part, to commit, or to

facilitate the commission of such violation, including, but not limited to, the following specific

property:

a.     A money judgment of at least $140,000, representing an amount of

proceeds derived by the conspiracies charged in Count One and Count Two of this Second

Superseding Indictment; and

b.     Approximately $8,370 in United States currency seized by law

enforcement from the possession of **CONCEPCION BENITEZ-PINEDA** on or about May 10,

2012.

35. Pursuant to Title 21, United States Code, Section 853(p), defendants **CONCEPCION BENITEZ-PINEDA, ALEX OMAR MEJIA MORENO, and NELSON AMAYA ESCALON**, if convicted of Count One or Count Two of this Second Superseding Indictment, shall forfeit substitute property, up to the value of the amount described in Paragraph 34(a), above, if, by any act or omission of the defendant, the property or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty. This property includes, but is not limited to, the following specific property:

a. All funds held in the name **CONCEPCION BENITEZ-PINEDA** at Wells Fargo bank/Wachovia bank, including but not limited to:

i. Account no. ending in 1541; and

ii. Account no. ending in 6332;

b. All funds held in the name **CONCEPCION BENITEZ-PINEDA** at BB&T bank, including but not limited to Account no. ending in 0074; and

c. All funds held in the name **CONCEPCION BENITEZ-PINEDA** at First Union National Bank.

36. Defendants **CARLOS LENIN MEJIA AMAYA, JOSE DELORES VANEGAS, and DOMINGO GOMEZ-RIVERA**, if convicted of Count Two of this Second Superseding Indictment, shall forfeit to the United States pursuant to Title 21, United States Code, Section 853, any property constituting, or derived from, any proceeds the defendant obtained, directly or indirectly, as the result of such violation, including, but not limited to any of the defendant's property used, or intended to be used, in any manner or part, to commit, or to

facilitate the commission of such violation, including, but not limited to, the following specific property: a money judgment of at least $14,000, representing an amount of proceeds derived by the conspiracy charged in Count Two of this Second Superseding Indictment.

37.     Pursuant to Title 21, United States Code, Section 853(p), defendants **CARLOS LENIN MEJIA AMAYA, JOSE DELORES VANEGAS,** and **DOMINGO GOMEZ-RIVERA,** if convicted of Count Two of this Second Superseding Indictment, shall forfeit substitute property, up to the value of the amount described in Paragraph 36, above, if, by any act or omission of the defendant, the property or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

38.     Upon conviction of the offense in violation of Title 18, United States Code, Section 924(c)(1)(A), set forth in Count Four of this Second Superseding Indictment, defendant **JOSE DELORES VANEGAS**, shall forfeit to the United States pursuant to Title 18, United States Code, Section 924(d) and Title 28, United States Code, Section 2461(c), any firearms and ammunition involved in the commission of the offense, including, but not limited to: a Sig Sauer P239 9mm handgun and a York .22-caliber handgun.

(Pursuant to Title 18, United States Code, Section 924(d), Title 21, United States Code, Section 853, and Title 28, United States Code, Section 2461(c).)

A TRUE BILL

Pursuant to the E-Government Act, the original of this page has been filed under seal in the Clerk's Office.

_____
Foreperson

NEIL H. MACBRIDE
United States Attorney

By: _____
SEAN P. TONOLLI
Assistant United States Attorney
SCOTT B. NUSSBUM
EMILY M. LOEB
Special Assistant United States Attorneys